STRUDWICK FUNERAL HOME, Inc., v.
NATIONAL LIFE & ACCIDENT INS.
CO., Inc.
No. 16769.

Court of Appeal of Louisiana. Orleans.
Nov. 15, 1937.

Porteous, Johnson & Humphrey and F. Carter Johnson, Jr., all of New Orleans, for appellant.

Harry R. Cabral, of New Orleans, for appellee.

WESTERFIELD, Judge.

This is a suit by the assignee of the beneficiary of an industrial life insurance policy for $400, against the insurer. The defendant answered admitting the issuance of the policy, the payment of the premiums, and the death of the insured, and defended upon the ground that the deceased had willfully misrepresented the condition of his health at the time the policy was applied for and that such willful misrepresentation amounted to a fraud upon defendant. The defendant also averred that it had paid to the beneficiary, Ella May Davis, plaintiff's assignor, the sum of $13.20, the amount of premiums collected on said policy and that Ella Mae Davis had granted to defendant a complete discharge and release of all liability under the policy sued on.

There was judgment below in plaintiff's favor as prayed for, and defendant has appealed.

Robert Gardiner, an illiterate negro, affixed his mark to an application for an industrial life insurance policy with the defendant company on May 2, 1936. In the application in response to questions 23 and 26, a negative reply was given. Question 23 was as follows: "What illness, injury or accident have you ever had? Give details." and Question 26: "Have you ever had heart disease, asthma, tuberculosis, cancer, ulcers, diabetes, fits, kidney disease, syphillis, paralysis, rheumatism, sciatica, vertigo, or any illness or disorder of the brain, lungs, spine or nervous system, or any disease not common to both sexes;. or suffered the total or partial loss of a hand, foot, eye or the use thereof? Are you deformed? Do you use intoxicating liquors, morphine, or other narcotics to excess? If yes, give particulars."

Gardiner died in the Eye, Ear, Nose and Throat Hospital in the city of New Orleans on December 2, 1936. The causes of death as they appear in the certificate of the attending physician were as follows: "Acute dilatation of heart—contributory causes: Aortitis, aortic aneurism, myocarditis and nephritis."

Dr. Wood, who attended Gardiner in his last illness, testified that the causes of death enumerated in the death certificate all involved "cardiac failure" but "the primary or beginning cause I would say was the stricture of his esophagus, which, due to the fact that he could not take food properly and nourish himself, weakened his condition so that he, of course, was subject to this cardiac failure." He further testified that Gardiner, when he entered the hospital on May 22, 1936, 20 days after signing his application for insurance, complained of having difficulty in swallowing and stated that he had had such difficulty for 2 or 3 months prior to that time.

Defendant contends that Gardiner knew when he applied for insurance that he was afflicted with a serious ailment and that he willfully withheld that information from defendant in order to obtain the policy which would not have been issued if the true facts concerning the applicant's health had been disclosed, thus constituting a fraud upon defendant. The amount of the insurance, $400, said to be the maximum that the defendant company issues to negro policyholders, is pointed to as a suspicious circumstance.

We are convinced that Gardiner knew that there was something the matter with his throat at the time he applied for the insurance. One of the witnesses described his condition as "a falling of the palate" which, we are told, is a term frequently used by illiterate negroes to designate any form of throat trouble. To quote from the reasons for judgment given by the learned judge, a quo, "Now, this Court happened to be born and raised on a plantation, on which lived several hundred negroes; he was raised among them and knows negroes from 'A' to 'Izzard'. One of the commonest beliefs of that race, especially the illiterate ones—and in my time practically all were illiterate—was that when any trouble of any nature or kind manifested itself in the throat, real or imaginary, it was caused by the palate falling, and there was one almost invariable remedy for this dreadful state. That was to gather together a lock of the wool on the top of the head, hold it as tight as fingers could hold it, and wrap it around with thread or cord, so that the bunch of hair was being almost pulled out by the roots."

There is no showing in the record that Gardiner had been treated by a physician at any time prior to his admission to the hospital on May 22, 1936. He was employed as a porter doing manual work. His employer testified that he worked continuously until August, 1936, without complaining about any illness except during the time that he suffered with a "fallen palate."

Ella Mae Davis, his beneficiary, with whom he lived, testified that the insured was in good health except when "his palate was down and he said he would have to have that put up and he would come right on back to work, and he left for that and came right on back to work."

There is no question of the soundness of the defense of fraud based upon the willful misrepresentation of the state of health of the insured at the time of his application for industrial life insurance which, as in this case, was issued without medical examination. Act No. 160 of 1934; Fox v. Life Insurance Company of Virginia (La.App.) 170 So. 55, 57; Pons v. Tharp-Sontheimer-Tharp Industrial Life & Burial Insurance Co. (La. App.) 173 So. 205. But the misrepresentation must be willful and in regard to a serious ailment.

"The word 'willful' as used in the statute must be reasonably interpreted. If, therefore, an applicant neglects to disclose a trivial ailment or medical consultation concerning such ailment, such concealment could not reasonably be regarded as 'willful' and have the effect of vitiating the contract of insurance because of fraud on the part of the assured." Fox v. Life Insurance Co. of Virginia, supra.

We find it impossible to conclude that Robert Gardiner, the ignorant negro assured, knew that he was afflicted with a serious ailment at the time he affixed his mark to the application for life insurance. It seems preposterous to us that he could have had any knowledge of the existence of "aortitis, aortic aneurism, myocarditis" or of "stricture of the esophagus." He knew he had a "fallen palate" which apparently did not yield to the treatment usually given that malady by members of his race so he applied to the hospital for relief, but there is nothing to

indicate that he believed he was suffering from a serious ailment. He probably thought that his difficulty in swallowing, about which he complained to Dr. Wood, was due to a sore throat which would soon yield to treatment. He did not mention his sore throat in his application, but he was not asked about throat trouble, though question 26 of the application seems to cover most of the ills which human flesh is heir to. He did not misrepresent anything, at least not willfully, because though his sore throat was due to a stricture of the esophagus, undoubtedly a serious disease, he did not know it. He may have had myocarditis also or aortic aneurism, both very serious heart ailments, but he did not know it. Because he applied for and obtained the maximum insurance which defendant will write upon the lives of negroes, is no more reason to suspect him of fraud, than his action in obtaining the policy shortly before his death. Neither circumstance is sufficient in itself, or in combination, to make out a case of fraud. If there were any proof that Gardiner knew or had cause to believe that his death .was imminent the situation would be different.

■ In regard to the premiums which were paid to Ella Mae Davis, the beneficiary, the record shows that these premiums were paid to her after the assignment of the policy. The payment could, therefore, have no effect upon the assignee.

For the reasons assigned the judgment appealed from is affirmed.

Affirmed.